IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

BROOKE SIMMONS, Individually            )
and as Independent Executrix of the     )
Estate of ANDIE SIMMONS,                )
                                        )
            Plaintiff,                  )        CV. NO. SA-12-CV-00528-DAE
                                        )
    vs.                                 )
                                        )
UNITED STATES OF AMERICA                )
and PAUL RICHTER, D.O.,                 )
                                        )
            Defendants.                 )
_____        )

ORDER: (1) DENYING AS MOOT DEFENDANT PAUL RICHTER'S NO-
EVIDENCE MOTION FOR SUMMARY JUDGMENT; (2) DENYING
DEFENDANT UNITED STATES'S MOTION TO STRIKE; (3) GRANTING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; AND (4)
DENYING AS MOOT PLAINTIFF'S MOTION TO EXCLUDE DR. STEVEN
BAILEY

On May 28, 2013, the Court heard Defendant Paul Richter's No-

Evidence Motion for Summary Judgment (doc. # 33) and Plaintiff Brooke

Simmons's Motion for Partial Summary Judgment ("Motion") ("MPSJ," doc.

# 43).  Christopher A. Payne, Esq., and Elizabeth Sutherland Janicek, Esq.,

appeared at the hearing on behalf of Brooke Simmons ("Plaintiff"); Clayton R.

Diedrichs, Esq., appeared at the hearing on behalf of Defendant United States of

America ("United States") and Fred Edward Davis, Esq., appeared at the hearing

1

on behalf of Defendant Dr. Paul Richter ("Dr. Richter").  Also before the Court are a Motion to Strike filed by the United States (doc. # 53) and a Motion to Exclude filed by Plaintiff (doc. # 42).  After reviewing the Motions and the supporting and opposing memoranda, the Court **DENIES AS MOOT** Defendant Dr. Richter's No-Evidence Motion for Summary Judgment and Plaintiff's Motion to Exclude, **DENIES** Defendant United States's Motion to Strike and **GRANTS** Plaintiff's Motion for Partial Summary Judgment.

<u>BACKGROUND</u>

This lawsuit stems from treatment that 34-year-old Andrew Simmons ("Andie") received from Defendants Dr. Richter and the United States, the latter through its employee Dr. Deborah Melendez ("Dr. Melendez").  Dr. Melendez, Andie's primary care physician, practiced family medicine at CentroMed County Line Clinic, a federally-supported health center in New Braunfels, Texas.  ("Melendez Depo.," MPSJ Ex. H at 12, 16–17.)  Andie first visited Dr. Melendez on November 9, 2009, complaining of heartburn.  (Melendez Depo. at 42:5–22.)  He reported a history of hypertension and had high blood pressure, so Dr. Melendez increased his Lisinopril, a medication used primarily in the treatment of hypertension.  (<u>Id.</u>; MPSJ at 29.)  On June 7, 2010, Andie again visited Dr. Melendez.  (MPSJ at 30.)  He complained of tightness in his chest and shortness of

breath when he worked out, and reported that the symptoms had worsened over the past 7 to 10 days.  (Id.)  He was prescribed hydrochlorothiazide for his hypertension and an inhaler for wheezing and shortness of breath.  (Id. at 33.)

On June 17, 2010, Andie went to the emergency department at Christus Santa Rosa Hospital in New Braunfels, Texas.  (Id. at 36.)  He told emergency department staff that he had been experiencing abdominal pain on and off for three weeks that had grown worse that day, although he denied being in pain while at the emergency department.  (Id. at 37.)  Andie suspected that he had an ulcer, and wanted to get it checked out before he went on vacation the following day.  (Id.)  He was seen by Dr. Richter, who collected blood and urine and ordered an X-ray taken.  ("Richter Depo.," MPSJ Ex. G at 139:21–25; MPSJ at 43–45.) Urinalysis revealed a slightly elevated white blood cell count, so Andie was treated for a bladder infection and discharged.  (MPSJ at 121–122.)

The next evening, at approximately 10:30 p.m., Andie went into cardiac arrest while sleeping.  (MPSJ at 128.)  His wife—Plaintiff Brooke Simmons—observed that he was in distress and called paramedics at 10:34 p.m. (Id.)  Upon arrival at the Peterson Regional Medical Center in Kerrville, Texas, he was unresponsive and no heartbeat could be detected.  (Id.)  He was pronounced dead at 11:34 p.m.  (Id. at 129.)  The Chief Medical Examiner of the Travis County

Medical Examiner's Office performed a postmortem examination at 9:45 a.m. on June 19, 2010, and concluded that Andie died as a result of atherosclerotic and hypertensive cardiovascular disease.  (MPSJ at 144.)  The Chief Medical Examiner noted that obesity was a contributory condition.[1]  (Id.)

On May 30, 2012, Plaintiff brought the instant wrongful death action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), alleging medical malpractice by Dr. Richter and the United States (collectively, "Defendants").  ("Compl.," Doc. # 1.)  Plaintiff first exhausted her administrative remedies, filing an administrative tort claim with the Department of Health and Human Services, which was deemed denied after six months, on May 18, 2012. (Compl. Ex. 1.)  Plaintiff's Complaint alleges that Defendants were negligent in failing to adequately assess and monitor Andie or intervene to prevent the cardiovascular event that killed him, failing to administer proper care, and failing to perform adequate diagnostic testing to determine the nature of Andie's illness. (Compl. ¶¶ 11–13.)  Plaintiff seeks damages on her own behalf and on behalf of her and Andie's children for pecuniary loss, loss of companionship and society, mental anguish, and for loss of inheritance on behalf of the children only.  (Compl. ¶¶ 15, 16.)

---

[1]  Andie was 75 inches tall and weighed 247 pounds.

On February 7, 2013, Dr. Richter filed the No-Evidence Motion for Summary Judgment that is currently before the Court.  (Doc. # 33.)  On February 21, 2013, Plaintiff filed a Response in Opposition (doc. # 34), and on March 19, 2013, Dr. Richter filed an untimely Reply in further support of his No-Evidence Motion for Summary Judgment (doc. # 37).  On March 21, 2013, Plaintiff filed a Sur-Reply without first obtaining leave of the Court.  (Doc. # 39.)

On April 15, 2013, Plaintiff filed a Motion to Exclude Dr. Steven Bailey, Dr. Richter's expert witness.  (Doc. # 42.)  Plaintiff asserts that Bailey's testimony must be excluded as unreliable pursuant to Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  On April 15, 2013 Plaintiff also filed the Motion for Partial Summary Judgment currently before the Court.  (MPSJ.)  Plaintiff's Motion seeks judgment on her claim against Defendant United States.  On May 6, 2013, the United States filed a Response in Opposition to Plaintiff's Motion for Partial Summary Judgment as well as a Motion to Strike Dr. Howard Miller's Affidavit filed in support of Plaintiff's Motion.  ("Opp.," Doc. # 53.)  On May 13, 2013, Plaintiff filed a Reply in further support of her Motion for Partial Summary Judgment, as well as a Response in Opposition to the Motion to Strike.  ("Reply," Doc. # 56.)

<u>LEGAL STANDARD</u>

I.      <u>Summary Judgment</u>

Summary judgment is granted under Federal Rule of Civil Procedure 56 when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); <u>see also</u> <u>Cannata v. Catholic Diocese of Austin</u>, 700 F.3d 169, 172 (5th Cir. 2012). The main purpose of summary judgment is to dispose of factually unsupported claims and defenses.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323–24 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact.  <u>Id.</u> at 323.  If the moving party meets this burden, the non-moving party must come forward with specific facts that establish the existence of a genuine issue for trial.  <u>ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc.</u>, 699 F.3d 832, 839 (5th Cir. 2012).  In deciding whether a fact issue has been created, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000).  However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment."  <u>Brown v. City of Hous.</u>, 337 F.3d 539, 541 (5th

6

Cir. 2003).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsuhita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

DISCUSSION

Plaintiff's Motion seeks summary judgment on her negligence claim against Defendant United States of America.  According to Plaintiff, there is no genuine dispute that Dr. Melendez had a duty to act according to a certain standard of care, that she breached that standard of care, and that Andie was injured as a result of Dr. Melendez's breach.  (MPSJ at 6–7.)  In response, Defendant United States does not deny that Dr. Melendez breached the applicable standard of care and that Andie was injured as a result.  (Opp.)  However, Defendant United States maintains that there is an issue for trial as to whether "Dr. Richter's care represents an independent cause or [an] intervening superseding act effectively breaking any causal link between the United States' treatment of [Andie] and his subsequent death."  (Id. at 3.)  In reply, Plaintiff denies that Dr. Richter's alleged negligence was an independent cause of Plaintiff's injuries, asserting that Dr. Richter's negligence acted in combination with the negligence of the United States.  (Reply

at 7.)

In its response to Plaintiff's Motion, Defendant United States moved to strike an affidavit submitted by Plaintiff in support of her Motion. (Opp. at 2.) The Court will address this preliminary matter before moving on to the substance of Plaintiff's Motion.

I.      Motion to Strike Dr. Howard Miller's Affidavit

On April 15, 2013, in support of her Motion for Partial Summary Judgment, Plaintiff submitted an affidavit executed by Dr. Howard Miller ("Dr. Miller") on April 10, 2013. ("Miller Aff.," MPSJ Ex. 1.) Dr. Miller stated that, in his opinion, Dr. Melendez breached the standard of care she owed to Andie by not ordering an EKG and cardiac consult based on the symptoms and risk factors he presented with on June 9, 2010. (Miller Aff. at 3.) Dr. Miller also stated that if Dr. Melendez had ordered the tests run, the atherosclerotic and hypertensive cardiovascular disease Andie suffered from would have been discovered and treated, thereby preventing his death. (Id. at 4.) In preparing the affidavit, Dr. Miller relied on Andie's medical records, the Travis County Medical Examiners' Report, the depositions of Dr. Richter and Dr. Melendez, and the deposition of Dr. Thomas Eades ("Dr. Eades"), an expert witness for the United States. (Id. at 2.)

Defendant United States asks the Court to strike Dr. Miller's affidavit,

arguing that "the time for expert reports is past and the affidavit of Dr. Miller is an attempt to circumvent the scheduling order in this case." (Opp. at 2.) Under the Court's scheduling order, the deadline for exchanging expert reports was January 14, 2013, the deadline for supplementing such reports was January 21, 2013, and the deadline for the completion of all discovery was March 14, 2013. (Doc. # 19.) In response, Plaintiff contends that Dr. Miller's affidavit is "nearly identical" to Dr. Miller's prior expert report, and that "[t]he substance of all opinions regarding standard of care and causation have not changed and have already been provided to Defendant United States of America." (Reply at 2.) According to Plaintiff, the only difference between Dr. Miller's expert report and the affidavit is that the latter incorporates the opinion of Dr. Eades, whose deposition was not taken until April 3, 2013 by agreement of all the parties. (Id.) Therefore, Plaintiff asserts, there was no delay—the affidavit could not have been amended until after Dr. Eades's deposition—and no prejudice to the defendant, since the substance of Dr. Miller's opinions did not change. (Id.)

The Federal Rules of Civil Procedure contemplate allowing parties to supplement expert reports, and in certain situations an expert must make additions or changes to his or her report. See Fed. R. Civ. P. 26(e). The deadline for making such additions and changes is 30 days before trial. See Fed. Rule Civ. P. 26(e)(2);

Fed. Rule Civ. P. 26(a)(3).  In this case, trial is set for July 15, 2013, so the

deadline for making changes and additions to an expert report is June 15, 2013

under the rules.  Dr. Miller's April 10, 2013 affidavit was submitted well within

that deadline.  As for deadlines set by scheduling order, they may be modified by

the Court for good cause.  Fed. R. Civ. P. 16(b)(4).  Here, Dr. Miller supplemented

his expert report after the scheduling order deadline had passed so that he could

incorporate the opinion of Defendant United States's expert witness, Dr. Eades.

Dr. Eades was not deposed until April 3, 2013—after the scheduling order deadline

for completion of discovery had passed.[2]  (Doc. # 35.)  As the court noted in Helen

of Troy, L.P. v. Zotos Corp., 235 F.R.D. 634, 637 (W.D. Tex. 2006), "it [would be]

inconsistent for [the defendant] to willingly participate in a discovery event and

later complain that a report based on that event and mandated by the Federal Rules

is untimely merely because it took place after the discovery deadline."

       In any event, it is unclear to the Court why allowing the Plaintiff to

submit the affidavit in question is "unfairly prejudicial" to the United States, as the

United States claims.  (Opp. at 2.)  The opinions expressed in Dr. Miller's affidavit

---

      [2] Dr. Eades's opinions may have been available to Plaintiff at an earlier date; he apparently prepared an expert report dated January 14, 2013 ("Eades Depo.," MSJ Ex. I at 17:18–20), but it is not attached to Defendant United States's February 5, 2013 Designation of Witnesses, Experts and Exhibits, as that document claims (doc. # 31 at 4 ("Dr. Eades CV and report are attached.")).

of April 10, 2013 do not appear to differ from the opinions expressed in the expert

report Plaintiff submitted to the Court on September 14, 2012 (doc. # 20 Ex. 2).

The two documents differ only in that the affidavit is more succinct than the expert

report, and refers to Dr. Eades's deposition testimony.  (Miller Aff. at 4.)  Dr.

Eades's deposition testimony does not alter Dr. Miller's opinion; as Plaintiff points

out, Dr. Eades's deposition testimony merely bolsters Dr. Miller's opinion that Dr.

Melendez was negligent.  (Reply at 2.)  The Court therefore declines to strike Dr.

Miller's affidavit as untimely.

II.    Plaintiff's Motion for Partial Summary Judgment

        The FTCA authorizes civil actions against the United States for

personal injury or death caused by the negligence of a government employee in

circumstances where a private person would be liable under the law of the state

where the negligent act occurred.  28 U.S.C. § 1346(b)(1).  In this case we apply

Texas law.  Under Texas law, to prevail on a cause of action for medical

negligence, the plaintiff must prove: (1) a duty by the healthcare provider to act

according to a certain standard of care; (2) a breach of the applicable standard of

care; (3) an injury; and (4) a causal connection between the breach of care and the

injury.  Mills v. Angel, 995 S.W.2d 262, 267 (Tex. App. 1999).

        The applicable standard of care is what an ordinarily prudent

physician would do under the same or similar circumstances, <u>Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios</u>, 46 S.W.3d 873, 880 (Tex. 2001), and is a threshold issue that must be established before determining whether the defendant physician breached the standard of care to a degree constituting negligence, <u>Quijano v. United States</u>, 325 F.3d 564, 567 (5th Cir. 2003).  As a general rule, "[u]nless the mode or form of treatment is a matter of common knowledge or is within the experience of the layman," expert testimony is required to establish the applicable standard of care and to determine whether it has been breached.  <u>Hood v. Phillips</u>, 554 S.W.2d 160, 165–66 (Tex. 1977); <u>see also</u> <u>Denton Reg'l Med. Ctr. v. LaCroix</u>, 947 S.W.2d 941, 950 (Tex. App. 1997).

Both Plaintiff's expert witness, Dr. Miller, and the United States's expert witness, Dr. Eades, agree that Dr. Melendez breached the applicable standard of care.  According to Dr. Miller, based on Andie's risk factors and complaints—specifically, that he was obese, smoked, and had high blood pressure and a family history of coronary artery disease, and complained of tightness in his chest and shortness of breath while working out—an EKG and a cardiac consult should have been ordered by Dr. Melendez on June 7, 2010.  (Miller Aff. at 3.)  In Dr. Miller's opinion, a failure to order the appropriate tests constituted a breach of the standard of care.  (<u>Id.</u> at 4.)  Dr. Eades concurred, stating:

> [Andie] came complaining of exertional chest discomfort, tightness, shortness of breath, and that's the only thing that you're going to get that accurately indicates coronary disease. . . and it was a fairly recent onset, which makes it different than angina. . . .  I think it had been present – he described it as a couple of weeks or maybe a couple of – but, anyway, it was – it was very – documented well that it was exertional, went away at rest, all the typical components of angina and should have had an EKG.

(Eades Depo. at 19:3–12.)  Dr. Eades went on to say that Dr. Melendez should

have referred Andie for a stress test as well.  (Id. at 19:13–15; 25:8–11.)  In Dr.

Eades's opinion, "Dr. Melendez's care fell below the standard of care for failing to

request an EKG."  (Id. at 18:16–18.)

       Having established that Dr. Melendez breached the applicable

standard of care, Plaintiff still bears the burden of demonstrating a causal

connection between the breach of care and Plaintiff's injury.  In order to show

causation, a plaintiff must "adduce evidence of a 'reasonable medical probability'

or 'reasonable probability' that [the] injuries were caused by the negligence" of the

defendant, meaning that it is "'more likely than not' that the ultimate harm or

condition resulted from such negligence."  Jelinek v. Casas, 328 S.W.3d 526,

532–33 (Tex. 2010) (quoting Kramer v. Lewisville Mem'l Hosp., 858 S.W.2d 397,

399–400 (Tex. 1993)).  Again, "[e]xpert testimony is necessary to establish

causation as to medical conditions outside the common knowledge and experience

of [the finder of fact]."  Ellis v. United States, 673 F.3d 367, 373 (5th Cir. 2012)

(quoting Guevara v. Ferrer, 247 S.W.3d 662, 665 (Tex. 2007)).

The two experts agree that, had Dr. Melendez ordered the relevant tests, Andie's cardiovascular disease would have been discovered and treated, and his death most likely would have been prevented. Dr. Miller's affidavit states that if Dr. Melendez had run an EKG and ordered a chest X-ray, cardiac blood work, and a chemical stress test, Andie's atherosclerotic and hypertensive cardiovascular disease would have been discovered. (Miller Aff. at 4.) During his deposition, Dr. Eades stated that, if an EKG had been performed on June 7, 2010 when Andie was suffering from tightness in his chest, the test "could have been normal," but "with a normal EKG . . . the conduct would have been elective referral for a stress test . . . sooner, rather than later." (Eades Depo. at 22:1–11.) According to Dr. Eades, a stress test performed on June 7, 2010 would "[v]ery likely" have revealed Andie's left anterior descending coronary artery lesion. (Id. at 25:13–15.) Later, Dr. Eades was asked: "If Dr. Melendez had done an EKG and even if – if the EKG had been abnormal and she had referred out the patient on the 7th . . . for a stress test, would that have prevented . . . [Andie's] death, in reasonable medical probability?" (Id. at 38:14–18.) Dr. Eades again replied: "Yes, very likely." (Id. at 38:19.) Thus, both experts agree that there was a causal connection between Dr. Melendez's negligence and the injury that led to Andie's death.

14

However, Defendant United States argues in its opposition to Plaintiff's Motion for Partial Summary Judgment that there nevertheless exists a genuine issue of material fact regarding the issue of causation.  Specifically, the United States contends that Dr. Richter's negligence was a new and independent cause of Plaintiff's injury, "effectively breaking any causal link between the United States' treatment of Mr. Simmons and his subsequent death."  (Opp. at 3.)  "A new and independent cause is one that intervenes between the original wrong and the final injury such that the injury is attributed to the new cause rather than the first and more remote cause."  Dew v. Crown Derrick Erectors, Inc., 208 S.W.3d 448, 450 (Tex. 2006).  It "supersedes the defendant's negligence by destroying the causal connection between that negligence and the plaintiff's injury, thereby relieving that defendant of liability."  Id.

An intervening force, or act, is not necessarily a new and independent cause merely because it—in addition to the defendant's negligence—causes the plaintiff's injury.  "Generally speaking, if the intervening force was foreseeable at the time of the defendant's negligence, the force is considered to be a concurring cause of the plaintiff's injuries, and the defendant remains liable for the original negligence."  Dew, 208 S.W.3d at 451 (internal quotation marks omitted); see also Pernod v. Schecter, 319 S.W3d 737, 745 (Tex. App. 2009).  A new and

15

independent cause, as opposed to a concurring cause, is typically not only

unforeseeable; its consequences are unexpected or extraordinary.  <u>Dew</u>, 208

S.W.3d at 451.  It "alters the natural sequence of events, produces results that

would not otherwise have occurred, is an act or omission not brought into

operation by the original wrongful act of the defendant, and operates entirely

independently of the defendant's allegedly negligent act or omission."  <u>Columbia</u>

<u>Rio Grande Healthcare v. Hawley</u>, 284 S.W.3d 851, 857 (Tex. 2009).  Texas courts

have also been guided by the Restatement of Torts, which identifies six factors that

are useful in determining whether an intervening force is a superseding, or new and

independent, cause of harm to another:

> (a)  the fact that its intervention brings about harm different in kind
> from that which would otherwise have resulted from the actor's
> negligence;
> (b)  the fact that its operation or the consequences thereof appear
> after the event to be extraordinary rather than normal in view of
> the circumstances existing at the time of its operation;
> (c)  the fact that the intervening force is operating independently of
> any situation created by the actor's negligence, or, on the other
> hand, is or is not a normal result of such a situation;
> (d)  the fact that the operation of the intervening force is due to a
> third person's act or to his failure to act;
> (e)  the fact that the intervening force is due to an act of a third
> person which is wrongful toward the other and as such subjects
> the third person to liability to him;
> (f)  the degree of culpability of a wrongful act of a third person
> which sets the intervening force in motion.

Restatement (Second) of Torts § 442 (1965).

16

While all of the above factors are relevant in determining whether an intervening act is a concurring or superseding cause, the "threshold, and often controlling, inquiry" is whether the intervening act and its consequences were foreseeable. <u>Dew</u>, 208 S.W.3d at 452.  Here, the alleged intervening force is Dr. Richter's negligence in failing to diagnose and treat Andie's cardiovascular disease on the evening of June 17, 2010.  Assuming that Dr. Richter acted negligently, his negligence and the consequences stemming from his negligence were reasonably foreseeable to Dr. Melendez.  When a doctor fails to diagnose and treat a patient's illness, it is foreseeable that the patient's symptoms will worsen, that he will seek out medical attention elsewhere, and that the subsequent physician may also err in his diagnosis and treatment.  <u>See</u> Restatement (Second) of Torts § 447 (1965) ("The fact that an intervening act of a third person is negligent in itself . . . does not make it a superseding cause . . . if . . . the actor at the time of his negligent conduct should have realized that a third person might so act. . . .").  As stated by the Texas Supreme Court in <u>Dew</u>, "[a]ny intervening acts which exploited [the] inadequacy [of the defendant's actions] did not fundamentally alter the foreseeable consequences of [the defendant's] original negligence."  208 S.W.3d at 453.

Consideration of other factors discussed above also weighs in favor of a finding that Dr. Richter's alleged negligence was not a new and independent

cause of Plaintiff's injury.  The risk of harm caused by Dr. Richter's negligence was the same as the risk caused by Dr. Melendez's negligence: Andie was not treated, and his worsening condition led to his death.  See Hawley, 284 S.W.3d at 859 ("[W]here the risk resulting from the intervening act is the same risk resulting from the original actor's negligence, the intervening act cannot be classified as a superseding cause."); Restatement (Second) of Torts § 442(a) (1965) (identifying as relevant "the fact that [an intervening act] brings about harm different in kind from that which would otherwise have resulted from the actor's negligence").  Moreover, the consequences of Dr. Richter's alleged negligence were not extraordinary; they were a natural result of the sequence of events brought into operation by Dr. Melendez's failure to accurately diagnose Andie's cardiovascular disease.  See Hawley, 284 S.W.3d at 857; Restatement (Second) of Torts §§ 442(b), 442(c).

Nevertheless, Defendant United States contends that Plaintiff's own expert reports demonstrate that there is a genuine dispute of material fact.  The United States points out that Dr. Diane Sixsmith and Dr. Jack Schwade opine that Dr. Richter breached the applicable standard of care and that his breach was a proximate cause of Andie's death, without addressing Dr. Melendez's negligence at all.  (Opp. Exs. 2, 3.)  Defendant United States argues that these statements

suggest that Dr. Richter's negligence may have been the sole cause of Andie's death, and therefore establish the existence of a genuine issue regarding whether Dr. Melendez was a proximate cause of his injuries.  (Opp. at 4.)

The Court disagrees.  The reports referenced by the United States do not indicate that Dr. Richter was the sole cause of Andie's death;[3] they merely state that his negligence was a proximate cause of Andie's death.  Dr. Sixsmith's initial report states that, in her opinion, Dr. Richter's negligence was a proximate cause of Andie's death, but acknowledges that "there may be more than one proximate cause of an event."  (Opp. Ex. 2 at 7.)  In a supplemental report, she states that after reviewing additional evidence—specifically, the depositions of Plaintiff, Dr. Richter, and Dr. Melendez—she believes that Dr. Melendez was also negligent, and that "such negligence was a proximate cause . . . of the death of Andie Simmons."  (Opp. Ex. 1 at 3.)  Dr. Schwade's report states that if Dr. Richter had performed the appropriate tests on Andie, the results would have led to a diagnosis of cardiovascular disease and Andie could have been treated and lived a "full, active and productive life."  (Opp. Ex. 3 at 4.)  Dr. Schwade did not review Dr. Melendez's deposition and was not asked to provide an opinion on the treatment

---

[3]  At the hearing, counsel for the United States represented to the Court that Dr. Sixsmith opined that Dr. Richter was the sole cause of Andie's death.  There is no support for this in the evidence presented to this Court.

she provided.  In short, although both experts opine that Dr. Richter's negligence was a proximate cause of Andie's death, neither opinion supports the United States's argument that Dr. Richter's negligence was an <u>independent cause</u> sufficient to break the causal connection between Dr. Melendez's negligence and Andie's death.

Thus, the Court concludes that Dr. Richter's alleged negligence was not a new and independent cause of Plaintiff's injury.  Defendant United States does not otherwise dispute that Plaintiff has established that Dr. Melendez owed Andie a duty to act according to a certain standard of care; that she breached the applicable standard of care; that her breach caused injury to the Plaintiff; and that there is a causal connection between the breach and the injury.  Accordingly, the Court concludes that there is no genuine issue for trial with respect to Plaintiff's claim against Defendant United States.

Finally, the Court **DENIES AS MOOT** Defendant Dr. Richter's No-Evidence Motion for Summary Judgment (doc. # 33) and Plaintiff's Motion to Exclude Dr. Steven Bailey (doc. # 42).  On June 11, 2013, Plaintiff and Dr. Richter notified the Court that they had reached a settlement (doc. # 65), thereby rendering moot the pending motions regarding Plaintiff's claims against Dr. Richter.

CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiff's Motion for Summary Judgment (doc. # 43), **DENIES** Defendant United States's Motion to Strike (doc. # 53), and **DENIES AS MOOT** Defendant Dr. Richter's No-Evidence Motion for Summary Judgment (doc. # 33) and Plaintiff's Motion to Exclude (doc. # 42).

IT IS SO ORDERED.

DATED: San Antonio, Texas, June 13, 2013.

_____
David Alan Ezra
Senior United States District Judge